IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-01813-PAB-BNB

LEICA GEOSYSTEMS, INC., a Delaware corporation,

     Plaintiff,

v.

L.W.S. LEASING, INC., an Illinois corporation, and
L.W. SURVEY ENGINEERING & DESIGN CO., an Illinois corporation,

     Defendants.

_____

**ORDER**
_____

This matter is before the court on the Motion for Summary Judgment [Docket No.
52] filed by plaintiff Leica Geosystems, Inc. ("Leica").  Leica seeks summary judgment
on the two counterclaims asserted by defendants L.W.S. Leasing, Inc. ("Leasing") and
L.W. Survey Engineering and Design Co. ("Survey").  Docket No. 52 at 2.  The motion
is fully briefed and ripe for disposition.

## I.  BACKGROUND[1]

This case arises out of a contractual dispute between plaintiff Leica and
defendants Survey and Leasing.  Leica is a company that manufactures and distributes,
among other things, airborne laser sensing systems.  One of Leica's products, the
ALS60 Light Detection and Ranging ("LiDAR")[2] system, is the subject of this lawsuit.

_____

[1]Unless otherwise indicated, the following facts are not in dispute.

[2]Generally, a LiDAR system utilizes a laser to scan terrain to gather geographic
data and is designed for use on an aircraft.

Survey is a company that specializes in cross-country utility routing for the communications and energy sectors.  Leasing provides, maintains, and supplies equipment for Survey's business.

Leasing purchased Leica's ALS60 LiDAR system for use on a Eurocopter AS350B2 helicopter ("Eurocopter").  Leasing claims that it was unable to use the LiDAR system because it could not obtain approval from the Federal Aviation Administration ("FAA") to install the system.  Leica disputed this fact and, after failed attempts to resolve the dispute, filed the current lawsuit.  In its complaint, Leica seeks a declaratory judgment that it fully satisfied its duties under the contract and also asserts claims against Leasing and Survey for a breach of contract.  Docket No. 1 at 3-5.  In response, Leasing filed counterclaims alleging that Leica breached its express warranty and the implied warranty for a particular purpose and negligently misrepresented information during the negotiation process.  Docket No. 16 at 6-12.

**A.   Federal Aviation Administration Regulations**

Under FAA regulations, any structural modification to an aircraft must be approved by one of the FAA field offices.  To receive FAA approval, a party can either secure a Supplemental Type Certificate ("STC") or it may execute a "field approval" through the issuance of a 337 Form.  The process of obtaining an STC may take anywhere from six months to three years and cost between $50,000 and $200,000.  An STC may only be issued by Aircraft Certification Offices ("ACO"), which are in different locations around the country, with each office specializing in a particular field.  The ACO located in Forth Worth, Texas focuses on rotorcrafts, which is the FAA's term for helicopters.  *See* Docket 54-23 at 18-22 (Wysong Dep. 27:19-31:9).

2

Field approval for a structural change to an aircraft, on the other hand, is obtained through one of the Flight Standards District Offices ("FSDO").  If an aircraft repair station attempts to do a particular modification and does not have an STC, the repair station must obtain field approval.  To secure field approval, a repair station must first complete the modification work on an aircraft and then file a 337 Form with its local FSDO.  The 337 Form is completed by a designated engineering representative ("DER"), an employee who approves or recommends approval to the FAA on any modification done to an aircraft.  *See Steenholdt v. FAA*, 314 F.3d 633, 634-35 (D.C. Cir. 2003) (a DER ensures that private industry clients who hire the DER are in compliance with FAA regulations and airworthiness standards).  A DER must be licensed under FAA Order 8100.8C, the Designee Management Handbook ("Handbook").  *See Jones v. LaHood*, 667 F. Supp. 2d 714, 715 (N.D. Texas 2009).  In the 337 Form, the DER details the work performed on an aircraft and works as a special liaison between FSDO and the aircraft repair station to ensure that the modification is in compliance with FAA regulations.

Because field approval requires that a repair station complete the modification to an aircraft before filing a 337 Form, the field approval process entails a significant risk. Accordingly, it is standard practice for an aircraft repair station to seek verbal approval from an FSDO that the 337 Form will be accepted before undertaking any modification work on an aircraft.  In this case, both sides agree that it is industry practice to make initial communication between an FSDO and a repair station.  Leica, however, asserts that industry practice envisions an iterative approach, whereby repair stations are not to cease efforts in the event of an initial, verbal rejection, but should maintain dialogue

with the FSDO to overcome concerns.  Docket No. 59 at 6.  Leasing disagrees and

claims that, because two modification stations–Uniflight and Wysong–refused to file

337 Forms, it was reasonable to believe that FAA approval was unattainable.

### B.   The Negotiation Process

In 2008, Survey sought to expand its business into the aerial mapping and

surveying field.  To do so, Survey purchased a Eurocopter through Leasing.

Additionally, Leslie Welch, Survey's president, hired Michael Fielding as Survey's pilot

who was given the responsibility for compliance with FAA regulations.  Khaled Gebarin,

a Survey employee, became Survey's primary negotiator in charge of locating a system

to perform the aerial mapping and surveying.  However, neither Gebarin, Welch, nor

Fielding had any experience with aerial surveying technology, FAA regulations, or

helicopter modification.

On March 21, 2009, Welch, Gebarin, and Seth Marsolek, Survey's General

Manager, held a meeting with Michael Graves, who ran a helicopter business, to learn

more about helicopter modifications.  At this meeting, Graves informed the Survey

representatives about STC-approved pods[3] and skids[4] used to install LiDAR systems

on helicopters.  Graves also informed the Survey representatives that STC approval

could take up to two years.

---

[3]A pod is an exterior casing that alters the structure of the helicopter and houses
the LiDAR system.  Docket No. 52-21 at 13 (Gebarin Dep. 67:16-25).

[4] A skid is a device placed on the side of a helicopter that commercial companies
use to mount LiDAR systems and skids do not require STC approval.  Docket No. 52-21
at 11 (Gebarin Dep. 40:11-13).

In the spring of 2009, Shawn Slade, an employee in Leica's Airborne Imaging and LiDAR sales department, informed Gebarin about Leica's LiDAR products. Through several phone conversations, Slade and Gebarin discussed Leica's ALS60 LiDAR system and began negotiations towards a purchase.

During these negotiations, Leasing claims that Leica was aware that Leasing had purchased a Eurocopter.  Docket No. 54-14 at 2 (Slade Dep. 82:17-24).  Leasing also asserts that, by June 2009, Leica knew that either Survey or Leasing intended to use the LiDAR System on a Eurocopter for which they had a pod.  Docket No. 54-14 at 7 (Slade Dep. 119:15-17); *see also id*. at 13 (Slade Dep. 166:6) ("I understood [Leasing to be affiliated with Survey].").

On May 27, 2009, Slade submitted a price quote to Survey for Leica's LiDAR system.  *See* Docket No. 52-24.  On June 24, 2009, Slade sent Gebarin two revised price quotes for the LiDAR system.  *See* Docket No. 52-25.  All three of these quotes included language located at the bottom of the last page which stated:

This quotation is subject to:

> a) our "General Conditions of Sale and Supply" and are valid for all our deliveries unless otherwise agreed in writing.
>
> b) our "General Conditions of Warranty"
>
> c) changes in the technical configuration without notice, due to product development.
>
> d) approval of export license.

Docket No. 52-24 at 9; *see also* Docket No. 52-25 at 14, 22.  Gebarin admits reading the entire quote from Leica but states that he never requested copies of the warranty terms.  Docket No. 52-21 at 18 (Gebarin Dep. 89:12-17).

Slade sent Gebarin two more revised price quotes on July 8, 2009 and July 10, 2009. Docket Nos. 52-27 and 52-28. Along with the July 10, 2009 price quote, Slade attached pictures of Leica's LiDAR system mounted on a helicopter. Docket No. 52-28 at 11-15. Slade previously informed Gebarin that the pictures of the helicopter were from TerraTec, one of Leica's customers located "in Norway." Docket No. 59-10 at 1.

On July 24, 2009, Craig Martineau, Survey's Resource Manager, asked Slade whether Leica had a DER to provide data to the FAA and obtain approval to install the LiDAR system in the Eurocopter. Docket No. 52-29 at 3. Slade replied that the modification shop (repair station) would have the information about DERs. *Id*. Slade also informed Martineau that Leica would only "install, test and train" on the LiDAR system once an aircraft had already been modified. *Id*. at 1.

On August 24, 2009, Leasing sent Leica a purchase order for the LiDAR system. Docket No. 54-5. Leasing sent a revised purchase order on the same day. Docket No. 52-30. Leasing did not send payment with the purchase order; rather, it asked Leica to consider providing short-term financing. Docket No. 52-23 at 1, ¶ 3. Leasing, however, provided $100,000 to Leica on September 23, 2009. Docket No. 52-23 at 2, ¶ 4. The parties also negotiated a payment schedule for the LiDAR system's purchase price. Docket Nos. 52-31 and 52-32.

On September 29, 2009, the LiDAR system was delivered to Leasing at Leica's office in Colorado; Leica warehoused the equipment until Leasing completed installation of the Dart Pod on the Eurocopter. Docket No. 54-21; *see also* Docket No. 54-20 at 3-4. On September 30, 2009, Leica sent Leasing an invoice acknowledging the delivery of the LiDAR system. Docket No. 52-33. The third to last page (and also

6

the last page) of this invoice contained links to two previously undisclosed websites concerning Leica's warranty.[5]

On October 27, 2007, Leica shipped the system to Uniflight, LLC, a repair station located in Grand Prairie, Texas.  Docket No. 52-37.  Once Uniflight received the LiDAR system, Leasing attempted to install the LiDAR system into its Eurocopter.  Jeremy Hardy was the avionics manager at Uniflight when Leasing's Eurocopter was delivered.  Docket No. 54-25 at 4 (Hardy Dep. 12:6-7).  Hardy sought field approval for the installation of the LiDAR system.  Luis Vargo, an aviation safety inspector with the FAA's FSDO office in Fort Worth, Texas, told Uniflight that he would not field approve installation of the LiDAR system on Leasing's Eurocopter.  Docket No. 52-42 at 35 (Vargo Dep. 34:1-4).  Leasing then brought the Eurocopter to Wysong Enterprises, Inc. in Georgia.  Wysong also refused to file a 337 Form for the installation of the LiDAR system on Leasing's Eurocopter.  Docket No. 54-17 at 1-2.

It appears that the FAA's reluctance to issue field approval related to a November 2006 Special Airworthiness Information Bulletin ("SAIB").  Docket No. 52-14 at 2, ¶ 5.  The SAIB apparently placed a temporary hold on field approvals for all airborne laser installations.[6]  Docket No. 52-38.  In order to allay the concerns

---

[5]The bottom of the page stated:

> Leica's terms apply, see https://portal.leicaus.com/US_GT_of_sales.txt.
> Standard warranty applies, at
> http://www.leica-geosystems.com/corporate/en/support/lgs_3434.htm.

Docket No. 52-33 at 10.

[6]Leica's LiDAR system is a "Class 4" laser.

surrounding the SAIB, Ben Roth, Leica's Product Manager for Airborne LiDARs, sent an

email distinguishing Leica's LiDAR system from the SAIB.  Docket No. 52-39.  On

February 8, 2010, Slade requested that Leasing stop contacting various FAA field

offices and allow Leica to pursue the matter.  Docket No. 54-28.  On February 17, 2010,

Steven Wright, Survey's then president, terminated Survey's attempts to form and

operate an aerial surveying and mapping business.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil

Procedure "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is

"material" if under the relevant substantive law it is essential to the proper disposition of

the claim.  *Wright v. Abbot Labs, Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only

disputes over material facts can create a genuine issue for trial and preclude summary

judgment.  *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An

issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997).  When reviewing a motion for summary judgment, a court must view the

evidence in the light most favorable to the nonmoving party.  *Id.*; *see McBeth v. Himes*,

598 F.3d 708, 715 (10th Cir. 2010).

A movant who bears the burden at trial must submit evidence to establish the

essential elements of its claim or affirmative defense.  *In re Ribozyme Pharms., Inc.*

8

*Sec. Litig.*, 209 F. Supp. 2d 1106, 1110 (D. Colo. 2002). By contrast, if the movant

"does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the

summary judgment stage by identifying a lack of evidence for the nonmovant on an

essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252

F.3d 1111, 1115 (10th Cir. 2001). The nonmoving party may not rest solely on the

allegations in the pleadings, but instead must designate "specific facts showing that

there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III.  ANALYSIS

### A.   Contract Formation

The parties agree that a contract exists; however, they disagree as to when it

was formed. Because this dispute involves the sale of goods, the parties agree that

contract interpretation is regulated by the Uniform Commercial Code ("UCC"). *See*

Colo. Rev. Stat. § 4-2-102. Neither party disputes that the two possible sources of state

law for contract interpretation purposes, Colorado and Georgia, have adopted the UCC

and that there are no measurable differences in the states' interpretation of the UCC

provisions relevant to this case. *See* Colo. Rev. Stat. § 4-1-101 *et seq.*; GA. CODE ANN.

§ 11-1-101 *et seq*. Accordingly, the Court will interpret the terms of the contract using

the law of the State of Colorado. *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1284

(10th Cir. 1997) ("*Avedon I*") (choice of law analysis is generally unnecessary if the

relevant states have identical controlling statutes, but may be required if the states

analyze the materiality of a contractual term differently); *see Liberty Steel Prods., Inc. v.*

*Franco Steel Corp.*, 57 F. Supp. 2d 459, 466 (N.D. Ohio 1999) (finding that, because

the states of New York and Ohio have almost identical versions of the UCC, the element of surprise or hardship was eliminated since the result would be the same under either law); *accord M.K.C. Equip. Co., Inc. v. M.A.I.L. Code, Inc.*, 843 F. Supp. 679, 686 (D. Kan. 1994) (finding that a choice of law analysis is unnecessary because Kansas and Indiana have no identifiable difference with regard to their interpretation of the UCC).  Using Colorado law, the Court will first decide the effective date of the contract.

As mentioned above, during contract negotiations, Leica provided price quotes to Leasing on May 27, 2009, June 24, 2009, July 8, 2009, and July 10, 2009.  Docket Nos. 52-24 to 52-28.  Thereafter, on August 24, 2009, Leasing sent Leica a purchase order for the LiDAR system.  Docket No. 52-30 at 2.  Despite tendering a purchase order, Leasing continued to pursue financing for the purchase price of the LiDAR system.  *See generally* Docket No. 52-29.

Subsequently, on September 29, 2009, after failing to secure alternate sources of funding, Leasing made a proposal to Leica for short-term financing for the purchase of the system.  Docket No. 52-31 at 1-2.  Leica accepted the proposed payment plan so long as Leasing agreed to a "5% interest on the outstanding amount each month." Docket No. 52-32 at 1.  Leasing agreed to these terms, *id.*, and on the same day, Leica delivered the LiDAR system to Leasing at Leica's warehouse, where Leica held it for Leasing.  Docket No. 54-21.

Under Colorado law, the existence of a contract is generally a question of fact to be determined by consideration of all facts and circumstances.  *I.M.A., Inc. v. Rocky*

*Mountain Airways, Inc.*, 713 P.2d 882 (Colo. 1986).  An offer and assent may be

manifested by acts or conduct creating a contract.  *Master Palletizer Sys., Inc. v. T.S.*

*Ragsdale Co., Inc.*, 725 F. Supp. 1525, 1531 (D. Colo. 1989).  The Court finds that the

contract between Leica and Leasing was formed on September 29, 2009.  The parties'

agreement was completed following the exchange of emails agreeing on a specific

payment plan for the system and the delivery of the system.  *See* Colo. Rev. Stat.

§ 4-2-204(1) ("[a] contract for sale of goods may be made in any manner sufficient to

show agreement, including conduct by both parties which recognizes the existence of

such a contract.").  Moreover, Leica's consent to warehouse the LiDAR system for

Leasing satisfied all of its obligations under the contract.  *See Cargill, Inc. v. Stafford*,

553 F.2d 1222, 1225 (10th Cir. 1977) (the UCC "rejects the subjective test of intent and

replaces it with mutuality of assent as manifested by the conduct of the parties."); *see*

*also* Colo. Rev. Stat. § 4-2-401(2) ("[u]nless otherwise explicitly agreed, title passes to

the buyer at the time and place at which the seller completes his performance with

reference to the physical delivery of the goods, despite any reservation of a security

interest").

Given that the parties' agreement was formed as of September 29, 2009, the

next question is whether the terms included in Leica's September 30, 2009 invoice

became part of the parties' contract.  Docket No. 52-33.  Leica's invoice contained an

internet link to its Standard Terms and Conditions of Sale ("Standard Terms").  Despite

the fact that the link was not available to Leasing prior to September 30, 2009, Leica

nonetheless contends that its Standard Terms are part of the parties' bargain because

its price quotes between May and July 2009 mentioned the existence of Leica's Standard Terms, *see* Docket Nos. 52-24 and 52-25 at 14, 22, and Leasing should have known about Leica's Standard Terms.  Leica argues that it cannot be held responsible for Leasing's lack of diligence in failing to review all of the terms provided in the price quotes.  The Court disagrees.

The evidence cited by Leica is insufficient to prove that Leasing assented to the Standard Terms or that they were part of the parties' bargain.  First, the price quotes submitted by Leica do not explicitly define Leica's Standard Terms nor do they provide a link to the internet address where Leasing could review these terms.  *See* Docket No. 52-24 at 9.  A party cannot agree to terms that are not included in or made available through the offer.[7]  Additionally, the record shows that the majority of the parties' negotiations centered around the price, payment method, and delivery of the LiDAR system and that no discussion of Leica's Standard Terms occurred.  Accordingly, Leica's Standards Terms are not part of the parties' original agreement, but instead are additional terms to the contract.  *See M.K.C. Equip. Co.,* 843 F. Supp. at 686 ("[w]hen an agreement already exists, the subsequent form is nothing more than a confirmation, and the courts inquiry is not whether a contract exists, but rather what the terms of the contract are.").

---

[7]Leica relies on *Spartech CMD, LLC v. Int'l Auto. Components Group N. Am., Inc.*, 2009 WL 440905 (E.D. Mich. Feb. 23, 2009), to support the view that Leasing should have inquired about the standard terms.  However, because in *Spartech* the terms and conditions provided links to the website, *id.* at *1, *Spartech* is distinguishable.

Since both parties are merchants and the dispute pertains to the sale of goods, *see* Colo. Rev. Stat. § 4-2-104(1), § 2-207 of the UCC governs whether Leica's Standard Terms became part of the parties' contract.   *See Avedon I,* 126 F.3d at 1283-84.   Section 2-207 of the UCC deals with two common situations.   The first is where an offer has been made and the acceptance comes by way of a standard form.   The second is where the parties have already reached an agreement and the standard form is merely a "confirmation" of that agreement.   Colo. Rev. Stat. § 4-2-207 cmt. 1 (the exchange of printed purchase order and acceptance forms oriented to the thinking of the respective drafting parties often do not correspond); *see Westinghouse Elec. Corp. v. Nielsons, Inc.*, 647 F. Supp. 896, 900 (D. Colo. 1986).   This case presents the latter scenario, whereby both Leica and Leasing had reached an agreement and the invoice of September 30, 2009 embodied the terms of the agreement but added terms not discussed by the parties.

Colorado's codification of UCC § 2-207 provides that a written confirmation received within a reasonable time is an acceptance even though it contains different terms, unless the acceptance is conditioned upon assent to the additional terms.   Colo. Rev. Stat. § 4-2-207(1).   Subsection 4-2-207(2) states that, between merchants, the additional terms become part of the contract unless: (a) the offer is expressly limited to the acceptance of the new terms; (b) the new terms materially alter the contract; and (c) objection is made to the new terms within a reasonable time.   Colo. Rev. Stat. § 4-2-207(2).   Here, it is undisputed that Leica's invoice did not expressly limit its acceptance to the terms of the invoice and Leasing did not make a timely objection to

the invoice.  Thus, the issue here is whether, pursuant to Colo. Rev. Stat.
§ 4-2-207(2)(b), the additional terms materially altered the contract.

Of the additional terms, the three most important are the disclaimer of the
implied warranty for a particular purpose, the limitation of remedy provision, and the
choice of law provision.

### 1.  Disclaimer of Implied Warranty for a Particular Purpose

Generally, additional terms materially alter an agreement when they "result in
surprise or hardship if incorporated without express awareness by the other party."
Colo. Rev. Stat. § 4-2-207 cmt. 4; *see also Avedon I*, 126 F.3d at 1284 n. 12.  Section
2-207 gives examples of clauses which would "materially alter" a contract and result in
"surprise or hardship" if incorporated in the contract and a choice of law provision is not
included.  *See* Colo. Rev. Stat. § 4-2-207 cmt. 4.

Under § 4-2-315, where the seller at the time of contracting has reason to know a
particular purpose for which the goods are required, there is an implied warranty that the
goods shall be fit for such purpose.  Colo. Rev. Stat. § 4-2-315.  *See also* GA. CODE ANN.
§ 11-2-315.  Section 5.3 of Leica's Standard Terms, however, includes a general
disclaimer of all warranties.  Docket No. 52-34 at 4, § 5.3.  Leasing argues that § 5.3 of
Leica's Standard Terms is a material alteration to the contract.  Docket No. 54 at 27.[8]

_____

[8]Section 5.3 states: "Disclaimer.  EXCEPT AS EXPRESSLY SET FORTH IN
THE SPECIFIC WARRANTY FOR A PRODUCT, SELLER MAKES NO
REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR
ORAL, RELATING TO THE PRODUCTS, OR THE PERFORMANCE OF ITS
OBLIGATIONS UNDER THE TRANSACTION DOCUMENTS, AND SELLER HEREBY
DISCLAIMS ALL IMPLIED WARRANTIES OR MERCHANTABILITY IMPOSED BY
LAW (INCLUDING, WITHOUT LIMITATION, WARRANTIES OF DESCRIPTION,
MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ALL

Courts have held that provisions disclaiming the applicability of warranties not expressly adopted by the parties materially alter a contract under UCC § 2-207(2)(b) since these provisions shift the distribution of risk between the parties. *See Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 105 (3rd. Cir. 1991); *Tuck Indus., Inc. v. Reichhold Chem., Inc.*, 542 N.Y.S. 2d 701 (A.D. 2d 1989); *cf. Valtrol, Inc. v. Gen. Connectors Corp.*, 884 F.2d 149, 155 (4th Cir. 1989). In addition, comment four of the advisory committee notes to Colo. Rev. Stat. § 4-2-207 clearly indicate that a "clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches" would materially alter the contract. Colo. Rev. Stat. § 4-2-207 at cmt. 4. Thus, the Court finds that § 5.3 materially alters the agreement and therefore is not a part of the parties' contract.

### 2. *Limitation of Remedies*

Section 6.1 of Leica's Standard Terms includes a limitation of remedies provision. Docket No. 52-34 at 4, § 6.1.[9] Applying the principles of Colo. Rev. Stat. § 4-2-207 to Standard Term § 6.1, the Court finds that the limitation of remedies provision in this case is a material alteration.

---

WARRANTIES OF COURSE OF DEALING OR USAGE OF TRADE) TO THE EXTENT PERMISSIBLE." Docket No. 52-34 at 4 (emphasis in original).

[9]Section 6.1(a) states: "Limitation of Liability. (a) SELLER WILL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES (WHICH MAY INCLUDE BUT ARE NOT LIMITED TO LOST PROFITS, LOSS OF USE, GOODWILL OR BUSINESS INTERRUPTIONS) ARISING OUT OF OR RELATING TO THE TRANSACTION DOCUMENTS OR THE PRODUCTS, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES." Docket No. 52-34 at 4 (emphasis in original).

Under Colorado law, the limitation of a seller's liability for incidental and consequential damages is a material alteration to the contract.  *Westinghouse*, 647 F. Supp. at 900 (finding that, under Colo. Rev. Stat. § 2-2-207, the purchase order materially altered the terms of the contract by sharply limiting liability for incidental and consequential damages); *see also Dale R. Horning Co. v. Falconer Glass Indus.*, 730 F. Supp. 962, 965 (S.D. Ind. 1990) (discussing UCC § 2-2-207).  Accordingly, Standard Term § 6.1(a) constitutes a material alteration and therefore does not become a part of the contract.

### 3.   *Choice of Law Provision*

Section 8.5 of Leica's Standard Terms contains a choice of law provision stating that Georgia law governs the terms and conditions to the agreement.[10]  Docket No. 52-34 at 5, § 8.5.  Leasing claims that the choice of law provision materially alters the parties' agreement because Georgia law does not recognize Leasing's claim for a breach of the implied warranty of fitness for a particular purpose and its claim for consequential damages.  Docket No. 54 at 19.  Leica argues that, because both Colorado and Georgia have implemented the UCC, its choice of law provision does not materially alter the contract.  Docket No. 59 at 13.  Leica also argues that the choice of law provision should be considered part of the contract because the state of Georgia has

---

[10]Section 8.5 states: "Governing Law and Jurisdiction.  These Terms & Conditions and the Transaction Documents are governed by the laws of the state of Georgia, USA and the parties submit to the exclusive jurisdiction of the courts in the state of Georgia, USA.  The parties hereby waive all rights to a jury trial in connection with claims under these Terms & Conditions and the Transaction Documents.  These Terms & Conditions and the Transaction Documents will not be governed by the United Nations Convention on Contracts fro the International Sale of Goods."  Docket No. 52-34 at 5.

a reasonable connection to the litigation and Leasing fails to show that Georgia law is contrary to any fundamental Colorado policy.  *Id.*

Few courts have reached the question of whether a choice of law provision constitutes a material alteration to the terms of a contract and the courts that have are split on the issue.  *See, e.g.*, *Dassault Falcon Jet Corp. v. Oberflex, Inc.,* 909 F. Supp. 345 (M.D.N.C. 1995) (finding that mutually exclusive choice of law clauses constituted material alterations to the contract); *Trans-Tec Asia v. M/V Harmony Container*, 435 F. Supp. 2d 1015, 1029-30 (C.D. Cal. 2005) (finding that a choice of law provision materially altered the contract because the contract had significant contacts with more than two jurisdictions); *but see Coastal Indus., Inc. v. Automatic Steam Prods. Corp.,* 654 F.2d 375, 378-79 (5th Cir. 1981) (choice of law provision did not materially alter parties' obligations under the contract); *see also Liberty Steel Prods., Inc. v. Franco Steel Corp.*, 57 F. Supp. 2d 459, 466 (N.D. Ohio 1999) (element of hardship is eliminated because New York and Ohio interpret the relevant section of the UCC in the same manner); *Walter Toebe Const. Co. v. Kard Welding, Inc.*, 2007 WL 4218961, *5 (E.D. Mich. Nov. 29, 2007) (a choice of law provision is not a material alteration because the claims pursuant to the contract will be governed by the UCC which both Michigan and Ohio have implemented in essentially identical form).[11]

In *Dassault*, the court faced contradictory choice of law provisions.  Because the two clauses were materially inconsistent with each other, the court applied the "knock

---

[11]"Because the UCC is intended to be applied uniformly across the various states, courts routinely turn to decisions from other states when there is no case law on point within the relevant jurisdiction."  *National Environmental Service Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001).

out" rule since it was impossible to give effect to both.  909 F. Supp. at 352 n. 8.  In

*Trans-Tec*, the court found that, because there were more than two jurisdictions with

significant contacts to the contract, it would be a surprise to any party if a choice of law

provision was implemented via additional terms without prior negotiation.  435 F. Supp.

2d at 1026.

 Unlike the aforementioned cases, the additional terms in this case are not

contradictory or inconsistent with any other terms in the contract, and the choice of law

determination involves only two jurisdictions.  The Court finds the reasoning of *Coastal*

*Industries* persuasive.  In *Coastal Industries*, Automatic, a New York corporation,

contracted to sell to Coastal, an Alabama corporation, machines that could press pants

to meet government specifications.  654 F.2d at 376.  Coastal made the offer to

Automatic by telephone, during which the only terms discussed were the price of the

machines, the method of payment, and the manner of delivery.  *Id*.  One month after the

telephone call, Coastal received an invoice, which it paid in full, and Automatic delivered

the machines to Alabama.  *Id*. at 377.  Once it realized that the machines did not meet

its requirements, Coastal filed a lawsuit against Automatic in the United States District

Court for the Southern District of Alabama.  Automatic claimed that the reverse side of

the invoice included several limiting clauses, including a New York choice of law

provision that the parties had not discussed.  *Id*.  Although Coastal argued that the

choice of law provision was a material alteration to the contract, the Fifth Circuit

disagreed and found that the addition of the clause would not cause surprise or hardship

because (1) Alabama and New York were the only two relevant states, thus the parties

18

must have contemplated that, absent a choice of law provision, the law of one of the two states would control, (2) since both states had adopted the UCC the result under either would be substantially the same, and (3) New York bore a reasonable relationship to the sales transaction at issue. *Id*. at 378-79.

Similarly here, the choice of law provision did not materially alter the parties' obligations under the contract as neither party faced extreme economic hardship because of the choice of law provision. *See Avedon Eng'g, Inc. v. Seatex*, 112 F. Supp. 2d 1090, 1094 (*Avedon II*) (D. Colo. 2000) ("the analysis of the existence of hardship focuses on whether the clause at issue would impose 'substantial economic hardship'"). Additionally, the State of Colorado has adopted the "most significant relationship" approach to the Restatement (Second) of Conflict of Laws for resolving choice of law questions in contract actions. *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003) (applying Colorado law); *see also* Colo. Rev. Stat. § 4-1-301. Under this approach, the Court applies the law of the state chosen by the contracting parties to govern their contractual rights and duties unless: (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice; or (2) application of the law of the chosen state would be contrary to a fundamental policy of a state whose law would otherwise govern. Restatement (Second) of Conflict of Laws § 187(2); *see Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994).

Georgia and Colorado both have a reasonable relationship to this transaction. The contract was negotiated in Colorado and Leica has its principal place of business in

Georgia.  The parties presumably contemplated that the law of either Colorado or Georgia would govern any disputes.  *Coastal Indus.*, 654 F.2d at 378-79.  Additionally, because the resolution of the parties' claims will rely primarily on the UCC, which both states have adopted, there will be no surprise as the result under either law will largely be the same.  *Id*.  Moreover, because the Court finds that Georgia law does not restrict Leasing's ability to assert its counterclaims, Leasing fails to show that application of Georgia law contravenes a fundamental policy of the State of Colorado.  *Hansen*, 876 P.2d at 113.  Accordingly, Standard Term § 8.5 does not materially alter the contract and the Court finds that it is a part of the parties' agreement.  Consequently, the Court will apply the law of the State of Georgia to Leasing's counterclaims.

### B.  Breach of Warranties

#### 1.  *Breach of Implied Warranty of Fitness for a Particular Purpose*

Under Georgia law, an implied warranty of fitness for a particular purpose is created if the seller has reason to know the particular purpose for which the goods are required and if the buyer has relied on the seller's skill or judgment to select the goods.  GA. CODE ANN. § 11-2-315.  Georgia law requires both that the seller know of the buyer's purpose and that the buyer rely on the seller's skill or judgment.  *Bruce v. Calhoun First Nat'l Bank*, 216 S.E.2d 622, 623 (Ga. App. 1975).  Additionally, the product must be defective or have latent defects that render the product unfit for the particular purpose intended.  *Imex Int'l., Inc. v. Wires Eng'g*, 583 S.E.2d 117 (Ga. App. 2003).

Leasing claims that Leica's LiDAR system was not fit for the particular purpose for which it was purchased, Docket No. 54 at 22-24, namely, to "conduct aerial mapping on

its helicopter and therefore the [LiDAR system] had to be able to be installed and used on its helicopter." *Id.* at 27.  Leasing states that, during negotiations, Slade told both Marsolek and Gebarin that: (1) the LiDAR system could be mounted on Leasing's Eurocopter and provide data; (2) the LiDAR system was already in use mounted on a helicopter similar to Leasing's; and (3) all that was necessary for the use of the LiDAR system was its installation on Leasing's Eurocopter.  *Id.* at 23.

The Court finds that Leasing has failed to establish a genuine dispute of material fact as to a breach of an implied warranty of fitness for a particular purpose.  Leasing does not provide any evidence that Leica's LiDAR system was defective.  *Imex,* 583 S.E.2d at 123.  Nor does Leasing provide any evidence that the LiDAR system could not be mounted on the Eurocopter, that the LiDAR system was not already in use in other helicopters, or that all that was necessary for the use of the LiDAR system was its mounting on Leasing's Eurocopter.  Docket No. 52-21 at 26-29 (Gebarin Dep. 171:16-174:21).  In fact, Gebarin admits that Leica never provided any incorrect information.  *Id.* at 26 (Gebarin Dep. 171:16-24).  Although Leasing accurately notes that a particular purpose envisions a specific use by the buyer, there is no indication in this case that the LiDAR system could not be "installed and used on its helicopter."  Docket No. 54 at 27.  Leica's counterclaim is merely an express warranty claim couched in terms of an implied warranty claim of fitness for a particular purpose.

Accordingly, because Leasing does not provide any facts to show that the LiDAR system could not be used on its Eurocopter, or that the LiDAR system was defective, the Court finds that there are no genuine issues of material fact, and Leica is entitled to

summary judgment on the counterclaim for breach of the implied warranty of fitness for a particular purpose.

### 2. Breach of Express Warranty

Leasing argues that Leica made the following express warranties during the course of contract negotiations: (1) Leica sent pictures to Leasing of a Eurocopter with a LiDAR system installed into a pod; and (2) Leica stated that, once the pod was installed in the Eurocopter, the FAA would approve the modification based on the pod's STC. Docket No. 54 at 22.  Leasing states that, although it was aware that FAA approval would be necessary, Leica expressly averred that the pod's STC would be sufficient to obtain FAA approval.  Leasing contends that Leica's express warranties were false because the FAA subsequently refused to approve Leasing's proposed modifications.

Under Georgia law, an express warranty is a representation made by a seller of goods, contemporaneously with and as part of the contract of sale, having reference to the character, quality, or title, by which the seller "promises or undertakes to insure that certain facts shall be as he then represents them." *N. Ga. Ready Mix Concrete Co. v. L & L Constr., Inc.*, 508 S.E.2d 722, 726 (Ga. App. 1998).  The decisive test, in determining whether language used is a mere expression of opinion or a warranty, is whether the language purported to state a fact upon which it may be fairly presumed the seller expected the buyer would ordinarily rely.  *Shepherd v. Aaron Rents, Inc.*, 430 S.E.2d 67, 69 (Ga. App. 1993).  Express warranties under Georgia law are governed by GA. CODE ANN. § 11-2-313.

### a.   Photograph of Helicopter

According to Leasing, Leica made an express warranty when it provided Gebarin

with a picture of a Eurocopter AS350 helicopter with a mounted LiDAR system.  Docket

No. 52-28 at 11-15.  Leasing claims that the picture of the Eurocopter constituted an

express warranty that Leica had previously installed a LiDAR system in a similar aircraft

with FAA approval.  Docket No. 54 at 22-23.  Leica responds that, on June 4, 2009, it

informed Leasing that the pictures of the helicopter were from "TerraTec in Norway."

Docket No. 59-10 at 1; *see also* Docket No. 52-28 at 1 ("see pictures of TerraTec's

helicopter").  Leica asserts that the pictures were not provided as an express warranty,

but rather only as an example of how a LiDAR system had been installed by one of its

customers in a Eurocopter.  Docket No. 59 at 15.

Given that Leica disclosed to Leasing on June 4, 2009 that the picture was of a

helicopter outside of the United States, *see* Docket No. 59-10, the Court agrees with

Leica that the photograph does not promise or undertake to ensure that certain facts

shall be as Leica then represented them, *N. Ga. Ready Mix Concrete Co.*, 508 S.E.2d at

726, and cannot create an express warranty that the FAA had previously approved the

installation of the LiDAR system on a Eurocopter.

### b.   Approval From FAA

Leasing claims that Leica made express warranties that, once the pod was

installed on the Eurocopter, the FAA would approve the installation of the LiDAR system.

In support, Leasing provides a July 27, 2009 email from Slade to Gebarin which states

that, after Leasing performed the modification on the Eurocopter, Leica would come and

"install, test and train on the [LiDAR] system."  Docket No. 52-29 at 1.  Additionally,

Leasing provides a September 10, 2009 email from Slade which again states that Leica

would "install the LiDAR into the pod once it is modified and attached to the helicopter,"

and that the "LiDAR does not need an STC" because "the pod already ha[d] a[n] STC."

Docket No. 54-19 at 4.

Moreover, Gebarin states that Slade made several representations to him that,

once Leasing secured a pod with an STC, the LiDAR system in the Eurocopter would be

approved because of the pod's STC.  Docket No. 52-21 at 27 (Gebarin Dep. 172:20-25).

Gebarin also claims that Slade stated, subsequent to the purchase and delivery of the

LiDAR system, that all that was necessary to commence use of the Eurocopter would be

to mount the LiDAR system.  *Id*. (Gebarin Dep. 172:1-6).

In response, Leica claims that it never guaranteed FAA approval; rather, it merely

advised Leasing that Leica would install the LiDAR system once the Eurocopter was

modified and approved.  Docket No. 54-14 at 19 (Slade Dep. 192:5-25).  Leica argues

that (a) Slade's use of the word "install" in the September 10, 2009 email meant only to

"install-assist" once FAA approval was secured, *Id.*; (b) Leica only expressly stated that it

would show Leasing how to "mount the [LiDAR system] into the pod [with the] electrical

components,"; and (c) Leasing knew that, despite the pod's STC, further action would be

necessary to obtain approval from the FAA for the use of the LiDAR system.  Docket No.

59 at 15; *see also* Docket No. 54-4 at 11 (Gebarin Dep. 69:23-25) (discussing the 337

Form for approval of aircraft modification).  The Court agrees with Leica.

First, Leasing's reliance on Slade's email from July 10, 2009 is misplaced.  As

noted above, Leica never disavowed the fact that it agreed to install and train Leasing's

24

employees on the use of the LiDAR system.  Leica contracted to assist in the installation

of the system once FAA approval was in order and Leica would aid Leasing's employees

understand how to "put the system in and take it out," mount the electronic components,

and bolt down the LiDAR system into the Eurocopter.  Docket No. 54-14 at 19 (Slade

Dep. 192:17-25).  Accordingly, there is no misrepresentation or failure to abide by the

terms of the contract since Leica was willing to perform all of the aforementioned tasks.

Second, Leasing's argument that it relied on Slade's statement that the "LiDAR

[did] not need an STC" is unsupported.  Given that Leasing's pod already had an STC, if

the repair station's drawings and the modifications were in compliance with the pod's

STC, then the modifications to the Eurocopter would only require field approval and not

an STC.  This is consistent with Leasing's understanding of the contractual negotiations

at the time since, on August 9, 2009, Fielding and Gebarin were in the process of

contacting repair stations to get DER approval for the aircraft modifications.  Docket No.

59-13 at 1.  It is undisputed that, throughout the parties' negotiations, Leasing was

aware that any modification to the Eurocopter would require approval from the FAA.  *Id.*

Given the fact that both parties understood that FAA approval was necessary, the

Court finds that no reasonable inference can be made that Leica warranted, expressly or

impliedly, that the FAA would approve the modifications to the Eurocopter. Leasing knew

that, even though the pod had an STC, it would be incumbent upon Leasing, not Leica,

to apply for field approval of the modifications.  *See Alternative Aviation Servs., Inc. v.*

*Meggit Ltd.*, 207 F. App'x 506, 512 (6th Cir. 2006) (finding that it would be unreasonable

for a party to believe that FAA approval was assured when that party knew that it would

bear the burden of obtaining FAA approval).  Thus, Leica's statements were not ones

25

that may fairly be presumed that Leica expected Leasing would ordinarily rely upon. *Shepard*, 430 S.E.2d at 69.

Viewing the facts in a light most favorable to Leasing, Leasing has failed to provide evidence showing that Leica made an express warranty that the FAA would approve the modifications to the Eurocopter.  Accordingly, the Court finds that there are no genuine disputes of material facts as to Leica's express warranty, and Leica is entitled to summary judgment on the counterclaim for breach of express warranty.

### C.  Negligent Misrepresentation

Leasing's negligent misrepresentation counterclaim is based on Leica's alleged representations that: (1) the LiDAR system was fit for Leasing's intended use and purpose; (2) the LiDAR system was already in use, mounted on a Eurocopter identical to that owned by Leasing, and all that was necessary to commence usage was mounting the system on Leasing's Eurocopter; (3) Leica had obtained an STC from the FAA for mounting the LiDAR system on the Eurocopter and, thus, no further approval was necessary; and (4) Leica would provide all necessary technical data and support for a lawful mounting and immediate use of the LiDAR system on Leasing's Eurocopter. Docket No. 16 at 10-11, ¶ 17.[12]

---

[12]Under Georgia law, the economic loss rule bars recovery in tort for purely economic losses.  *Busbee v. Chrysler Corp.*, 524 S.E.2d 539, 541 (Ga. App. 1999); *Squish La Fish, Inc. v. Tomco Specialty Prods., Inc.*, 149 F.3d 1288, 1291 (11th Cir. 1998) (applying Georgia law).  Georgia courts, however, have adopted two exceptions to the economic loss rule – the accident exception and the negligent misrepresentation exception.  *Squish La Fish*, 149 F.3d at 1291.  Under Georgia law, "negligent misrepresentation [is] an exception to the Economic Loss Rule in tort cases."  *U. S. Fid. & Guar. Co. v. Paul Assocs., Inc.*, 496 S.E.2d 283, 291 (Ga. App. 1998).

The elements of a negligent misrepresentation claim under Georgia law are: (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such person's reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance. *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 479 S.E.2d 727, 729 (Ga. 1997).

The Court finds that Leica is entitled to summary judgment on Leasing's negligent misrepresentation counterclaim.  Leasing has failed to raise a genuine issue of material fact that these statements were false. *Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1383 (M.D. Ga. 2005) (finding that, under Georgia law, a party cannot sustain a claim for negligent misrepresentation absent allegations of a false statement). As noted above, Leasing does not provide any facts to show that the LiDAR system could not be used on its Eurocopter or that the LiDAR system was defective.  Additionally, Leasing fails to provide any evidence that the LiDAR system was not in use on a similar Eurocopter.  In fact, Slade's email from June 4, 2009 explains that TerraTec's Eurocopter in Norway uses a dart pod on the right skid of the helicopter for its laser.  Moreover, Gebarin, Leasing's main negotiator for the purchase of the LiDAR system, states in his deposition that it was his "understanding that the [LiDAR system did] not need an STC."  Docket No. 52-21 at 14 (Gebarin Dep. 68:19-25).  Gebarin also knew that only the pod had an STC, *id*., and his deposition makes it clear that Leica only represented that, because the pod had an STC, there was no need for an additional STC so long as the LiDAR system was installed within the pod. *Id*. at 15 (Gebarin Dep. 69:6-8).  Thus, from the evidence in the record, it is clear that Leasing understood that Leica would "provide all the engineering services and drawings" for the repair station to modify the equipment, and

27

not that Leica had an STC from the FAA for mounting the LiDAR system on Leasing's Eurocopter.  *Id*. at 14 (Gebarin Dep. 68:5-8).

As to the final alleged misrepresentation, Leica has never refuted the fact that it agreed to install and train Leasing's employees on the use of the LiDAR system. However, because the system was never installed in Leasing's Eurocopter, Leica did not have an opportunity to fulfill this obligation.  As a result, given that none of the Lecia's aforementioned representations are false, Leasing cannot satisfy all of the elements of negligent misrepresentation.  Accordingly, the Court finds that there are no genuine issues of material fact, and Leica is entitled to summary judgment on this counterclaim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Amended Motion for Summary Judgment Against [Defendants'] Counterclaims [Docket No. 52] is **GRANTED**.  It is further

**ORDERED** that the Motion to Set Briefing Schedule on Governing Law [Docket No. 70] is **DENIED**.

DATED May 31, 2012.

BY THE COURT:


  s/Philip A. Brimmer                                    
PHILIP A. BRIMMER
United States District Judge

28